Wisniewski v. Diocese of Belleville. Mr. Wells? Yes, sir. Want to proceed? May it please the Court? Sure, go ahead. Counsel. In this appeal, Mr. Wisniewski is asking that this Court overlook several recent Illinois Supreme Court decisions, as well as prior decisions of this Court. Mr. Wisniewski asks the Court to overlook the recent case of Doe A v. The Diocese of Dallas, which supports our position that the Diocese's motion for summary judgment should have been granted based on over 115 years of precedent cited in Doe A. As the Illinois Supreme Court said in Doe A, once a childhood sexual abuse claim is time-barred, it cannot be revived without offending due process protections of our Constitution. Doe A reversed the appellate court decision on which Mr. Wisniewski relies and leaves him without support. Unfortunately, at the time we filed our motion for summary judgment at the trial court level, and at the time we filed our post-trial motions, the trial judge did not have the benefit of the Doe A decision. Doe A reaffirms and extends the Illinois Supreme Court's prior ruling in Immiage v. Elwage that the statute of repose created in the 1991 Childhood Sexual Abuse Act bars childhood sexual abuse claims by anyone who turned 30 years old before it was repealed in January of 1994. Mr. Wisniewski turned 30 years of age on March 6, 1991. Under Immiage and Doe A, his claims should be barred. Doe A states in unquestionable clarity that allegations virtually identical to Mr. Wisniewski's cannot support the tolling of his claims by fraudulent concealment, equitable estoppel, or equitable tolling, because the diocese did absolutely nothing to prevent him from filing his lawsuit. Mr. Wisniewski always possessed the requisite knowledge to file his lawsuit against the diocese. He always remembered the abuse, he knew it was wrong, and he knew the accused priest was a diocesan priest. He simply waited until October of 2002 to file his lawsuit. He filed his lawsuit some 25 years after the last incident of abuse, 21 years after the statute of limitations had run, and 11 years after the statute of repose barred his claims. The timeline in this case is clear and leaves no doubt that Mr. Wisniewski's claims are time-barred under Doe A, Immiage, and the Illinois Supreme Court decision in Clay v. Kuhl. Let me speak a little bit further about the statute of limitations. Mr. Wisniewski's claims for sexual abuse are barred under the common law statute that was codified in 1991. This statute required Mr. Wisniewski to bring his lawsuit within two years after he reached the age of majority, or March 6, 1981. Because Mr. Wisniewski always remembered the abuse, knew that it was wrong, and knew that Kanacki was a priest with the diocese, he cannot rely on the discovery rule to toll the statute of limitations. The Illinois Supreme Court case in Clay v. Kuhl is particularly instructive. In that case, the Illinois Supreme Court found that there is no requirement that the plaintiff must notice the full extent of his or her injuries before a suit must be brought under the applicable statute of limitations. Illinois law presumes an intent to harm and a resulting injury from the type of misconduct allegedly committed by the defendant in that case. Because the Clay plaintiff did not repress her memories and was aware that the defendant's misconduct was harmful, her claims were untimely under the discovery rule and properly dismissed. The Clay case is factually on all fours with this case. Both plaintiffs never repressed the abuse. Both plaintiffs contend that they did not know the connection between the abuse and their injuries until shortly before filing their lawsuit. Like Clay, Mr. Wisniewski's claims should be dismissed. There are additional sexual abuse cases in which recently discovered claims did not toll the statute of limitations. They're in our brief, but most importantly is the case Vinton v. Vonneman decided by this court in 1997. Let me next address the statute of repose. Let me just ask a question about the statute of repose. I think I heard you say that Mr. Wisniewski turned 30 in 1991, which is the same year the statute of repose was passed, is that right? Yes, it was a fact. The repose was in effect when he turned 30. When was that passed? When was that statute of repose passed? 1991. And which occurred first? Did he turn 30 first or was the statute passed first? He was born, Mr. Wisniewski was born March 6, 1961. Okay. So in 1991. What was the effective date of that act if you know? It was effective, hold on, January 1, 1991. Okay, so under your argument about that then, once that became effective January 1, he in effect, as far as the statute of repose goes, setting aside statute of limitations, had two months to file his suit. Yes. Okay, go ahead. Under the statute of repose, as you point out, when he turned 30, the cause of action was done away with, and that's the Illinois Supreme Court decision in MEH. And the timing in MEH is somewhat similar to what we have here. Doe A was the basis for a very recent decision in Johnson v. Augustinians by the First District. And Johnson, the plaintiff, was born in 1963 and was the subject of the statute of repose. He alleged memory repression, disassociation, and that he had only recently been able to connect his severe psychological and emotional problems with the abuse against him by the clergy. The appellate court, the First District, affirmed the trial court's dismissal in light of the recent decision in Doe A and went on to say that it is now well settled under Doe A that due process prohibits the resuscitation of a time-barred plaintiff, regardless of whether the plaintiff was aware of the abuse or if they were injured by the abuse. Other notable statute of repose cases by this court, Benton v. Vonderman in 1997, and more recently, Galloway v. The Diocese of Springfield, decided in 2006. The statute of repose is blind to knowledge-based arguments. A statute of repose, and this is from Benton, is intended to terminate the possibility of liability after a defined period of time, regardless of a potential plaintiff's lack of knowledge of his cause of action. Of course, here, the plaintiff was well aware of his cause of action. Further from Benton, by this court, if a period of repose expires before a potential plaintiff discovers his cause of action, the possibility of liability is terminated regardless of the plaintiff's knowledge of his right. You're saying that fraudulent concealment has no bearing on the statute of repose. Exactly. And that's what the NEH and the other cases have dealt with. Let me move out, if I can, to the issue of fraudulent concealment. It's the position of the diocese that this should have never been submitted to the jury and that it was there. Mr. Wisniewski makes the argument that the Illinois Supreme Court has never addressed 13215, but rather has dealt exclusively with 13205. And we know that in Dopey, the Illinois Supreme Court dealt with 13205. But also the Illinois Supreme Court has dealt with this 13215. They dealt with it in Clay v. Poole. The Supreme Court dealt with it in the Orlock case and in the DeLuna case. So there's plenty of case law out there on 13215 as well as 13205. But there's no difference. They both provide a five-year limitation period. And the elements of fraudulent concealment would be the same whether it's 13205 or 13215. It's really a distinction without a difference. Mr. Wisniewski in this case made essentially the same allegations that the plaintiff in Dopey made on the issue of fraudulent concealment. In Dopey, the plaintiff alleged that the church officials were aware of the previous abuse by the priest involved prior to the plaintiff's alleged abuse. Mr. Wisniewski makes the same allegations. In Dopey, the plaintiff relied on other reports of sexual misconduct having surfaced within the church hierarchy after the incident in which he was involved. Mr. Wisniewski makes the same allegations. And finally, in Dopey, the plaintiff alleged that he did not experience or become fully aware of the injuries caused by the sexual abuse until years later. Mr. Wisniewski makes exactly the same allegations. The Illinois Supreme Court in Dopey stated, and I think it's particularly important, While the two fraud counts in the plaintiff's complaint had allegations that defendants deceived the plaintiff by withholding information regarding Fr. Roberts' history and their knowledge of that history, it is clear from the complaint that all of the injuries claimed by the plaintiff ultimately arose from the sexual abuse he suffered rather than from defendants' failure to properly apprise the plaintiff regarding Fr. Roberts' past and what they knew about it. And that's exactly what we have here. What Mr. Wisniewski complained and what his injuries arose from were the alleged sexual abuse, not any information that was withheld from him. Dopey should be dispositive on this fraudulent concealment count defense. Mr. Wisniewski does not allege any injuries from the diocese's allegedly deceptive conduct in withholding information regarding Panaki's history and the knowledge of that history. Under Doe A, because the limitations period governing a claim is determined by the nature of the plaintiff's injury rather than the nature of the facts from which the claim arises, any attempts to reframe a cause of action of fraud or attempting to evade a limitations defense by a claim of fraudulent concealment should fail. Again, the recent case in the First District of Johnson v. The Augustinians is helpful. It supports our position in this case. In that case, the plaintiff, again it's an abuse case, alleged that he only recently had been able to connect his injuries with the abuse by two clergy members in 1976-1979. The Johnson court held that the statute of repose barred the claims even when the plaintiff alleged it was the defendant's concealment of the pedophiliac conduct of the priests and brothers that contributed to his inability to discover the abuse until recently. So I think the Johnson case is right on point. Under 215, whether you look at any of the cases that have been cited, including Doe A, under Clay, Orlak, and DeLuna, the concealment that is necessary for it to apply must be of affirmative acts or representations calculated to lull or induce a claimant into delaying filing of his or her claim to prevent a claimant from discovering a claim. And when you look at the record in this case, there are no affirmative acts or representations by the diocese that were calculated to lull or induce Mr. Wisniewski into delaying the filing of his claim or to prevent him from discovering his claim. There's nothing in the record about any affirmative acts undertaken by the diocese in this area. What I read is a direct quote from Orlak at the Illinois Supreme Court in 2007. In fact, in this case, the last conduct, contact, between Panaki and Mr. Wisniewski was in the 82-83 time frame when, according to the trial testimony, Mr. Wisniewski had a dinner with Mr. Panaki in Champaign, Champaign, Urbana, where he was living or going to school. So from that time on, there was absolutely no contact between Panaki and Mr. Wisniewski or between anyone in the diocese and Mr. Wisniewski. From then on, absolutely no contact. And in his trial testimony, Mr. Wisniewski admits that the diocese did not do anything to prevent him from filing his lawsuit in a timely manner. What he said was if he had thought about it, he would have filed, but he didn't think about it. That doesn't rise to the level of fraudulent concealment. Now, it's argued by Mr. Wisniewski that no affirmative acts of concealment are necessary, which is inconsistent with the cases, the Illinois Supreme Court cases that are cited. And he says that there should be a fiduciary relationship here or a confidential relationship. However, the Illinois courts have made it clear that there is no duty, fiduciary or otherwise, that exists between the parishioner and the diocese. Let me move on then to equitable estoppel, another defense raised to the statute of limitations and the statute of repose. And under Illinois law, equitable estoppel does act to bar a statute of repose. Under certain circumstances, it can. There's a difference between it and fraudulent concealment. Do you agree with that? Yeah. Well, fraudulent concealment can fall under appropriate circumstances. A statute of repose? Under the lumen. Okay. Yes, under the lumen. But for equitable estoppel to apply here, the diocese must have misrepresented or concealed material facts. Mr. Wisniewski had to reasonably rely on the misrepresentation or concealment, and such reliance had to induce Mr. Wisniewski to fail to commence his action within the limitation period. Again, there's no evidence in the record that the diocese did anything to dissuade him or prevent him or discourage Mr. Wisniewski from filing his lawsuit. So the elements of equitable estoppel are not met in this case. The evidence is just not there. As the Swan Court pointed out, the party asserting the estoppel must have relied on the act or misrepresentation, and because of the reliance, refrained from commencing an action within the limitations period. Let me next move on to equitable tolling. Mr. Wisniewski cites the case of Clay v. Kuhl, an Illinois Supreme Court case, saying that under certain circumstances, equitable tolling can't apply under these circumstances. However, in Clay, the Illinois Supreme Court held that equitable tolling did not apply in that case, where the plaintiff alleged 900 separate childhood sexual abuse incidents because there were no attempts by the defendant clergyman to prevent the plaintiff from asserting her rights in a timely manner. That's exactly what we have here. Citing from Clay v. Kuhl, the court did say that equitable tolling may be appropriate if the defendant has actively misled the plaintiff, or the plaintiff has been prevented from asserting his or her rights in some extraordinary way, or the plaintiff has mistakenly asserted his or her rights in the wrong form. We'll have time, you'll have time for rebuttal. Thank you. Members of the court, Mr. Wells, Administrator, Mr. Wiginton, this lawsuit is about Jim Wisniewski. Jim was the victim of several instances of abuse when he was a minor child by a priest of the Belleville Diocese. The jury heard ample evidence and testimony concerning that abuse and then reverted in favor of Jim and against the diocese, finding that the diocese was guilty of negligence, willful and want misconduct, fraud, and conspiracy, and that their misconduct was a cause of Jim's injuries. Now, the defendants would like that verdict set aside, and in doing so, they're not contesting the evidence that Jim was, in fact, abused. They're not contesting the evidence that their misconduct was a cause of that abuse. They're not contesting that Jim was injured. They're not even contesting that the $5 million awarded to him was excessive. What they're seeking is to avoid liability, to avoid responsibility based upon the statute of repose or statute of limitations. In doing so, they rely heavily on the recent Supreme Court case of Doe A. Mr. Wells made a comment that somehow the plaintiffs are relying upon Doe A or the Fifth District decision of Doe A. This matter went to trial before that decision came down, and Judge Guido felt compelled to decide the case based upon the MEH case. Because although Doe A, the Fifth District opinion, had come down and hadn't gone to the Supreme Court, and what separates this case from Doe A, and those cases cited by the defendant, the concept of fraudulent concealment, equitable stopover, equitable total, those issues were not addressed in Doe A. They weren't addressed in the Galloway case that they cite. They weren't addressed in the Johnson case that they cite. What Doe A said is that the 2003 amendments apply retroactively unless application of the amendment to a pending action would violate Constitution, violate the due process right. And the Doe A court clearly held that once a claim is time barred, you can't revive that claim by a subsequent amendment or repeal of a statute. In Doe A, the issue was the victim in 1998, although the victim was abused years before and turned 18 years before, did not seek any treatment or did not discover any injury until 1998. And the court looked at that as the triggering point, the time when the statute of limitations was to arise. However, in 1988, there was a two-year statute of limitations, and the plaintiff did not file suit within that two years. Subsequently, there was amendment, which went into effect in 2003, extending the statute of limitations from two to five years. And the plaintiff filed lawsuit about four years, 11 months after discovering his injury in 98. And what the Supreme Court did was simply restate its position in NEH that in 1998, you had two years under the old statute, and that ran in 2000. So extending that statute to five years later on couldn't revive that previously time-barred claim that was revived, that was barred by 2000. But Doe A should not be the grounds for reversal of the jury's decision in this case for two reasons. One, because of the tolling effects of fraudulent concealment or equitable tolling that told Jim's claims because they were never time-barred prior to 2002 when he discovered his injury. And secondly, the concept of equitable estoppel. Equitable estoppel, it really doesn't matter when Jim's cause of action accrued or when his cause of action became subject to a firm defense of statute of limitations or statute of repose. The concept of equitable estoppel presumes that you have a statute of limitations or statute of repose defense that you can raise. But the court recognizes that under certain circumstances, a defendant is precluded from doing so. And none of those issues, as I said earlier, were addressed in the Doe A case. Now, equitable – the doctrine of equitable estoppel was raised in the present case. And it wasn't just raised at the pleading stage.  And the issue was addressed in the testimony in the evidence. And after the jury was out considering their charge, which was their first charge with addressing the issue of fraudulent concealment, which they found in favor of the plaintiff. But when they were out, Judge Guido entered an order where he stated that after considering all the evidence and testimony, regardless of the party by which it was presented, and after assessing the credibility of the witnesses, finds that plaintiff's claims against the defendant are not barred by statute of limitations or statute of repose, based on equitable estoppel and equitable tolling having been established by clear and convincing evidence. It's the defendant's burden to establish that that ruling is somehow improper or not based on adequate evidence. What's the basis of his ruling? Well, we'll turn to them separately. Equitable estoppel and equitable tolling have some different elements. With regard to equitable estoppel, there's basically three elements. The defendant misrepresented or concealed material facts that the plaintiff relied upon those misrepresentations or concealment. And as a result thereof, the plaintiff failed to commence his action within the limitations period. The facts with regard to these three elements, we'll look to the misrepresentations or concealment. The undisputed evidence was back in 1973, before Jim was ever abused, that the diocese was aware that Father Konecki had represented to several of his victims that the sexual encounters with him were not harmful or not injurious. To the contrary, they were beneficial for them. They were good for them. God wanted people to love each other. The other priests didn't. The diocese knew about that. They knew about his manipulation and coercion of his victims. In fact, they knew back then about Jean Parks. They knew that Father Konecki had raped her. And then he manipulated and coerced her to come live with him when he was transferred to Washington Park, to St. Martin of Tours. Convinced her that a rape wasn't injurious or harmful. In fact, convinced her parents to let her come and live with him, supposedly as his housekeeper. They were also aware that Father Konecki had manipulated and coerced two boys from Guatemala, two minor boys, to come back to live with him in the States, to live with him in his house, and he abused at least one of them. They were aware that he had manipulated and coerced another 14-year-old girl at St. Martin of Tours. Not that the affair that he was having with her was injurious or harmful to her, but it was good for her. Then when the diocese was confronted by the Jean Parks matter, they instructed Father Braun to hold a cleansing ritual to try to have her forgive and forget and move on. And then they took Father Konecki and they assigned him to St. Teresa's parish. And they held him out. They held him out as being a good, pious, and devout man, someone who was safe to minister to the youth of that parish, and someone who was safe to have unsupervised conduct with their minor children. And what did Father Konecki do there? He did the same thing he had done with these other minors. Between coercion and manipulation, but Jim was new to him, a young boy at that time, he told him, what we're doing is not bad for you. It's not injurious to you. It's not harmful to you. It's actually good for you. It's helping you to become a man. It's helping me, Father Konecki, relieve my stress. The diocese then, in 1982, discovers that Konecki had abused Jim Wodeski. They found out about his abusing another boy at that time. And they found out again that Father Konecki is telling these boys, it's not harmful, it's not injurious, it's good for you. God wants people to love one another. And what do they do? They tell that boy whose family came forward to keep it quiet, don't say anything, and Father Konecki's transferred. And what happens when Father Konecki's transferred? He makes a statement in the press that he's being transferred, not because he injured or harmed boys, but because he wanted to transfer to work with an Hispanic community. And the diocese was aware of that, and they ratified that conduct. They didn't repudiate it. In fact, when it came to their attention, and the family that brought the allegations forward to them complained, they told them, let bygones be bygones. Monsignor Schwebel testified that what the Diocese of Belleville did in 1982 when they knew about Jim Wodeski was they treated him like dirty money. We have to remember that there was no physical abuse associated with any of the sexual abuse, no physical injuries. Jim was told it was not injurious or harmful to him. And that takes us to the second component, the reliance, the reasonable reliance. Now Jim's testifying that based upon Father Konecki being a representative of the diocese, being held out as someone safe to minister to him, coupled with Father Konecki telling him, this is good for you, it's not harmful, it's not injurious, he came to believe that. The medical testimony, the only testimony presented to medical witnesses in this case, was that what Father Konecki did and what the diocese knew that he was doing and condoned and ratified and did not repudiate. When did he discover he had a cause of action? He did not discover he had a cause of action until 2002. Because that's when his injuries developed. The medical testimony is that Jim suffers from post-traumatic stress disorder delayed onset type. That's a psychiatric diagnosis. And what happened in 2002, Jim had developed defense mechanisms. He believed that he had been injured or harmed, and what happened in 2002 was a Boston sex scandal. When all this was in the papers and the news, and Jim at that time started to have flashbacks, he started to have nightmares, he started to have panic attacks, and that's when he sought treatment, and he was diagnosed with that condition. And both of the doctors testified that what happened to Jim was a form of brainwashing, that he had been doomed into believing that he had not been harmed or injured. He didn't realize he was harmed. He did realize what happened, though, some 20 or 30 years prior. He never realized he was harmed, period. That testimony is not only from Jim Matuski, but from the doctors as well. He came to believe that he wasn't harmed, and it wasn't until 2002. He realized his harm, but he'd always remembered what happened. He remembered the instances of sexual contact with Father Kornathian, but he never thought he was harmed by it. And that's an important distinction in this case. Totally different than... Therefore, his discovery of the cause of action in your position did not occur until after he actually remembered his injury or manifested his injury. Absolutely. And that's a difference from the Clay case. The Clay case specifically says that the statute doesn't start when you discover the full extent of your injuries. In this case, Jim didn't develop any injuries until 2002, certainly didn't know of any injuries whatsoever until 2002, and that evidence was uncontradictory. The defendants have claimed repeatedly in their briefs some 15 times that Jim admitted that he was harmed, always knew he was harmed. As I just said, that's totally contrary to the evidence. I know that Mr. Wells didn't say it here today in his argument, because that's contrary to the evidence. There's not one bit of testimony anywhere in this record that Jim knew he was harmed or injured when the abuse occurred. The doctrine of equitable stoppage is designed to prevent a party from taking advantage of their own wrongdoing. And their wrongdoing, again, was by not publicizing it? Well, first of all, they allowed Father Konacki, and were complicit in his conduct of telling his victims that he was not harmed. They concealed all knowledge of Father Konacki's wrongful conduct. They went to great lengths to conceal it, and there's a good reason why, because they didn't want to be sued. They found out about Jim in 1982, and they went to great steps to keep that quiet. They didn't approach Jim in 1982. In fact, testimony is, when they established the Review Board in 1993, they kept the information from Bishop Gregory, and they kept the information from the Review Board. Why? Because the Review Board, one of their challenges, one of the things they were supposed to do, is contact the victims and find out if they'd been harmed or injured, and if so, offer them some type of treatment or counsel. They didn't give that information to the Review Board. They concealed it from their own people. They were watching the file, hoping Jim never did anything, and if he did, raise the statute of limitations or statute of opposing offense. The doctrine of equitable stopover, according to the Franti case, the test is whether, considering all the circumstances of the case, good conscience and honest dealing require the defendant to be stopped. If good conscience and honest dealing don't require the defendant to be stopped, in this case, I don't know what does. Equitable tolling, to get to the second point of your question, is a little different. In equitable tolling, it's appropriate if the plaintiff has been prevented from asserting his or her rights in some extraordinary way. It applies if, through some lack of information or circumstances beyond the plaintiff's control, he doesn't file suit. Well, that's exactly what we have here. Jim was brainwashed and duped into believing that he was not injured or harmed, and certainly the Austin sex scandal in 2002 was something beyond his control, and that's what caused him to develop post-traumatic stress disorder of the delayed onset time, and only then did he have a cause for action. Certainly, he did not know at any time about the diocese's wrongful conduct, as they'd gone to great lengths to conceal their own complicity. With regard to fraudulent concealment, the... Just a quick question there. Sure. Can fraudulent concealment be applied to bar a statute of repose? Absolutely, the DeLuna case. And DeLuna... Justice Carwin clearly states that. And Mr. Wells first said it doesn't, and then... That's why I wanted to ask you. Clearly. And that's significant in this case, because that fraudulent concealment was not part of the DeLuna case. It wasn't part of the Johnson case. It's what sets this case apart, in addition to equitable tolling and equitable stop and phone and those other cases. And what that says is that if someone actively conceals from a victim his cause of action, then when that victim discovers that concealment, they have five years. The defendant wants to argue that common law fraud claim in Doe A is the same as a fraudulent concealment defense to a statute of limitations or statute of repose, and that's clearly different. It's wrong. Doe A just said, oh, we've got a claim for fraud, but the underlying injuries, personal injuries... Could you explain to me again how the cause of action was concealed? Again, the cause of action in this case was concealed in a number of ways. First of all, the injury or damage being done to this boy was concealed. As I've indicated before, the conduct, the undisputed testimony, the brainwashing, the duping of him. Basically, if you don't know you're injured until some future time, then your cause of action accrues at that time? There has to be some concealment for fraudulent concealment to apply, and clearly we have that here. You've got to remember that Father Konecki is an agent, an employee of the diocese. He's the representative of the diocese that's assigned to this church, and he's telling his victim, you're not being injured, you're not being harmed. This is good for you. It's helping you to become a man. Other priests do it. They're concealing from him his injury. They also, the diocese, conceal their knowledge of Father Konecki being a serial rapist and molester, and their own conduct in enabling him to do so. Again, in 1982, they find out about him, and they go to great lengths to conceal not only their involvement and knowledge, but they also go to great lengths to make sure that Jim Wisniewski is not contacted. You've got to also remember that in other instances where they found out about minors, they never contacted the minor's parents to address the abuse, again trying to conceal that these children were being injured or harmed by what was taking place. My recollection from the briefs, anyway, as far as the delayed onset post-traumatic stress disorder, Mr. Wisniewski was not a troubled person through his life. He hadn't been to counseling or other psychologists. This all came in 2002. He was married, had two kids, had a good job, and his whole world came crumbling down in 2002 when the testimony of the doctors was his defense mechanisms came crumbling down. And he developed post-traumatic stress disorder at that time, quite similar to developing asbestosis years after being exposed to asbestos. I do want to touch on the Clay case very quickly, if I may, is that I talked earlier about the distinction about the full extent of his or her injuries. In this case, we're not saying that Jim did not know the full extent of his injuries until 2002. We're saying he didn't have any injuries and certainly didn't know of any injuries caused relating to his abuse until 2002, clearly different from Clay and clearly different from the Parks case, a woman who was raped and assaulted. Can I finish that point? Yes. And the other issue is this presumed intent to harm that's addressed in Clay. This presumption is really applied to the perpetrator. The case inside of my Clay said it's a – one's an insurance case. It's whether the perpetrator intended to commit harm. The more important issue is presumption. I looked it up. Merriam-Wilson defines it as disposed to be true without proof, in law to assume to be true in the absence of proof to the contrary. Clearly, in this case, if there was a presumption, it was rebutted. The only evidence presented in trial was that Jim didn't know he was armed for injury until 2002. The science has come a long way with regard to the effects of child sexual abuse when a victim knows or can appreciate their injury. In fact, the 2003 amendments to the Child Sexual Abuse Act rectify that comment in Clay because they specifically said that knowledge of the abuse does not constitute discovery of the injury or the causal relationship between the delayed discovery of the injury and the abuse. Let me ask you a question. Had the priest passed away? The priest is still alive. He is still alive. Yes. He would send Christmas cards to his Newsky family up until his lawsuit was filed. Thank you, counsel. Any rebuttal? Yes. Thank you. Since there has been mention of the De Luna case, I think it's important that we understand the facts of that case because I think it's clearly distinguishable from what we have here. The De Luna case involved an underlying medical malpractice and wrongful death action. What happened in De Luna was without the plaintiff's knowledge, the attorney intentionally filed the complaint without the necessary affidavit in order to test the constitutionality of the affidavit requirement. This fact was actively concealed from the defendant. You have an attorney-client relationship, clearly a fiduciary relationship. Different than what we have here. Under the fiduciary relationship, the Illinois Supreme Court in De Luna, Justice Carmire said there's a duty to disclose, which we all recognize. It deals with fraudulent concealment and deals with the statute of repose. Here you have a fiduciary relationship. But beyond that, what you had in De Luna were affirmative statements misleading the client. When the appeal had been decided and the case had been lost by the lawyer, he told his client that things were going well. And he said that on a number of occasions. Kept telling his client things were going well when he had lost it at the trial court and he'd lost it at the appellate court. So you've got the fiduciary relationship. And the affirmative statements misleading his client. And kind of the icing on the cake there is that you've got a client that doesn't speak English. Needed an interpreter. So I don't think De Luna's on point. You asked if there's a case out there. There is a case out there. Can't argue with the conclusion, but the facts were outrageous. We don't have it here. On the injury issue, I think play be cool is right on point. It's hard to get around the language. What the court said, and I quote, there is no requirement that a plaintiff must know the full extent of his or her injuries before the suit must be brought under the applicable statute of limitations. Further, notably, Illinois law presumes an intent to harm and a resulting injury from the type of misconduct allegedly committed. The argument here is that there were no injuries until 2002. And is that what the evidence was? The evidence was that after Mr. Wisniewski saw Mr. Wildmonster, he went to Dr. Peterson. Dr. Peterson did his report and made his findings. But under play be cool, there is a presumption of injury. And here is the point. What does that mean? My question was, was the testimony at trial that he had no, he sought to recover for post-traumatic stress disorder, is the way I understand it. And that didn't occur until 2012. No, that was just one of the symptoms that they described. But it was for the injuries of abuse. The testimony concerning the injury came from their expert, Dr. Peterson. And Dr. Peterson is the one that came up with the theory that he didn't know he was injured, that he was brainwashed. Mr. Wisniewski never testified that he'd been brainwashed. In fact, Mr. Wisniewski always maintained that he remembered what happened, he knew it was wrong, and he knew that Kanacki was the priest of the diocese. The record does state that he firmly stated he knew that it was wrong? Yes. Yes. Here's the blog I prepared. Here's where he says, I always had knowledge of what happened. Next question. He may have told you one thing, but you knew yourself that what was going on was wrong and inappropriate, correct? Yeah. Did you consider Father Kanacki a representative of the diocese of Delaware? Yes. So he knew what happened, and he knew it was inappropriate, and he knew it was wrong. And some of the same language that you heard here this morning is reminiscent of what was argued in the Benton case decided by this court. And in the Benton case, the plaintiff said, that the conduct was not sinful, was part of God's plan, and was appropriate. These are the same allegations. Thank you, gentlemen, for your arguments and your briefs.